IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| OBH, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | 8:02CV374 & 8:04CV460 |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | MEMORANDUM OPINION |
| | ) | |
| Defendant. | ) | |

The plaintiff, OBH, Inc. ("Berkshire"),[1] commenced these now-consolidated tax suits seeking a refund of approximately sixteen million dollars for federal income taxes plus assessed interest it claims was erroneously assessed under 26 U.S.C. § 246A for the 1989, 1990, and 1991 calendar tax years. The United States asserts that its assessment complies with the statutory requirements in § 246A and denies that Berkshire is entitled to any refund.

A trial to the Court, sitting without a jury, was held on September 26-28, 2005. The Court, having considered the evidence, the briefs and arguments of counsel, and the applicable law, hereby makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

---

[1] OBH was formerly known as Berkshire Hathaway Incorporated. The company changed its name from Berkshire Hathaway to OBH as part of a December 1998 merger transaction. Because the plaintiff was named Berkshire Hathaway during the tax years in issue, the Court will refer to the plaintiff as Berkshire for purposes of this opinion.

**JURISDICTION**

This is an action arising under the internal revenue laws for the recovery of taxes and interest assessed against and collected from Berkshire.  Berkshire paid the disputed taxes and interest, timely filed administrative claims for the same, and commenced these refund actions within the limitations period established by statute.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422.

**STANDARD OF REVIEW AND BURDEN OF PROOF**

In tax refund actions brought pursuant to 28 U.S.C. § 1346(a)(1), tax assessments made by the IRS are normally entitled to a presumption of correctness.  *Page v. Commissioner of Internal Revenue*, 58 F.3d 1342, 1347 (8th Cir. 1995).  This presumption fails, however, where the IRS makes the assessment without any foundation or supporting evidence.  *Id*.  The taxpayer bears the burden of proving, by a preponderance of the evidence, that the IRS' assessment is arbitrary or erroneous.  *Id.; North Dakota State University v. U.S.*, 255 F.3d 599, 603 (8th Cir. 2001).

-2-

## FINDINGS OF FACT

### I.   The Four Borrowings At Issue In This Dispute

The dispute over the application of § 246A involves the following four debt transactions Berkshire engaged in during the late 1980's:

a.   A January 13, 1988, debenture offering, which yielded proceeds of approximately $150 million (the "$150 million debenture").

b.   A January 29, 1988, debenture offering, which yielded proceeds of approximately $100 million (the "$100 million debenture").

c.   A September 29, 1989, zero-coupon bond offering, which yielded proceeds of just under $391 million (the "$391 million zero-coupon bond").

d.   A December 29, 1989, investment contract with the California Housing Finance Agency, which yielded proceeds of approximately $109 million ("the $109 million Housing Contract").

During the course of a formal audit, the Internal Revenue Service(the "Service") claims to have traced portions of these borrowings to the purchase of certain dividend-paying stocks.  Based on these traces, the Service concluded that Berkshire had overstated its dividends-received deduction for 1989, 1990, and 1991 calendar tax years.

### II.  Berkshire's Business Activities

Berkshire is a Delaware Corporation with its principal place of business in Omaha, Nebraska.

-3-

Berkshire is the common parent of an affiliated group of corporations filing a consolidated federal income tax return.

Berkshire's and its subsidiaries' investment and other capital allocation decisions are made by Warren E. Buffett, Chairman of Berkshire's Board of Directors, in consultation with Charles T. Munger, Vice Chairman of Berkshire's Board of Directors.

Berkshire owns several subsidiaries that are engaged in various commercial activities, including the publication of a newspaper and the sale of a wide variety of consumer goods including candy, jewelry, and home furnishings.

For many years, including the years at issue, Berkshire's most significant operations have been in the property and casualty insurance and reinsurance businesses, operated through the Berkshire Hathaway Group of Insurance Companies.

The largest member of the Insurance Group during the years at issue was National Indemnity Company ("NICO"). In the mid to late 1980's, NICO's primary business involved writing commercial auto and general liability policies. (Trial Transcript ("T.T.") at 9:6-15). NICO was also in the business of writing "super-catastrophe" and other large-risk reinsurance policies during this time.[2] (T.T. at 11:11-14). It, however,

---

[2] Super-catastrophe policies provide reinsurance to other insurers in the event of major catastrophic occurrences -- such as earthquakes, hurricanes, or other disasters -- where the underlying losses may reach into the billions of dollars.

-4-

was not viewed as a significant reinsurer in the 1980's. (T.T. at 11:11-14).

In approximately 1985, Mr. Buffett and Ajit Jain, the manager of NICO, set out to turn NICO into one of the world's premier reinsurance companies. (T.T. at 12:11-13).

Mr. Buffett decided that the only real way to put NICO on the map as a premier reinsurer was to increase NICO's financial strength. (T.T. at 11:21-25; 12:1-3).

Mr. Buffett increased NICO's financial strength, in part, by engaging in a series of borrowing transactions in the late 1980's. (T.T. at 25:16-25). Four such borrowings are those at issue in this case.

The proceeds from these borrowings, along with all other sources of available capital, were invested by Mr. Buffett in hopes of obtaining a decent return. (T.T. at 18:16-17).

Today, NICO, is not only on the map; it is the best regarded reinsurer in the world in terms of financial strength. (T.T. at 13:23-24). NICO is the only insurance company in the world rated triple A by both Moody's and Standard and Poore's. (T.T. at 13:20-24). A triple A rating, which is based on a company's immediate financial condition and financial future, is the highest rating that Moody's and Standard and Poore's grants. (T.T. at 14:2-7).

## III.   Disposition of Proceeds From the Four Borrowings

Berkshire contributed the proceeds from the four borrowings at issue to NICO's capital account.  (T.T. at 33:25; 34:1-2).

NICO maintained a single bank account at Norwest Bank located in Omaha, Nebraska, through which virtually all of its receipts and disbursements flowed.  (T.T. at 66:23-25).

When the debt proceeds were deposited into NICO's account, the proceeds were commingled with the beginning cash balance in the account, receipts from NICO's operations, and proceeds from the sale of other securities, among other things.

NICO's account had millions of dollars flowing through it in a single day.  During the 1988-1989 time-period, approximately $2.3 billion of proceeds from sources other than the debt proceeds were deposited into NICO's account.

Due to the fungibility of NICO's account, it is impossible to determine whether the proceeds, or a portion thereof, were used for general operating expenses or for investment.  However, because  Berkshire's practice at all relevant times was to keep the funds in NICO's account as close to fully invested as possible, (T.T. at 82:17-18), it is likely that a significant portion of the proceeds were ultimately invested by Mr. Buffett.

Mr. Buffett's philosophy in investing the proceeds was to choose whatever form of investment *on that day* presented the best opportunity to maximize NICO's capitalization and net worth. (T.T. at 22:17-18).

Mr. Buffett generally utilizes a variety of security investments in investing the Insurance Group's capital.  These securities include:  stocks, bonds, government bonds, corporate bonds, municipal bonds, high-yield bonds, and preferred stocks. (T.T. at 18:22-25; 19:1-2).

## IV.  The Service's Audit of Berkshire

The IRS commenced a formal audit of Berkshire's books in 1991.  (T.T. at 165:23:25).

The audit was commenced at the suggestion of Revenue Agent Thomas Way Powell.[3]  (T.T. at 244:1-3).  Mr. Powell believed, based on an article in *Forbes Magazine*, that Berkshire may have been reaping tax benefits by debt-financing its purchases of dividend-paying stocks.  (T.T. at 244:4-10).

Mr. Powell, who was assigned by his superiors to look specifically at the § 246A issue, (T.T. at 166:12:13), spent approximately three years examining Berkshire's books and records before ultimately concluding that § 246A should apply to reduce

---

[3] Agent Powell retired from the Service in 2002.  (T.T. at 165:21-22).

-7-

Berkshire's dividends-received deduction for the 1989, 1990, and 1991 calendar tax years.  (T.T. at 165:23-25).

Mr. Powell prepared a revenue report on or around November 1, 1994, summarizing his findings on the § 246A issue. This report consists of a series of "flow of funds" analyses of certain receipts and disbursements from NICO's bank account. (Ex. 7).

As part of the government's case, Mr. Powell undertook an independent re-examination of the borrowings and prepared a report in October of 2004 ("2004 Report").  This report consists of a narrative report accompanied by forty-nine pages of tracings.  (Ex. 21).

In both reports, Mr. Powell concludes, based on his "flow of funds" analyses, that Berkshire's dividends-received deduction for the years in question should have been reduced under § 246A because some of the proceeds from the four separate debt transactions were "directly attributable" to Berkshire's purchases of dividend-paying stocks.  (Ex. 7 at 66 ; Ex. 21 at 8-11).

Mr. Powell, in interpreting § 246A, concluded that the proceeds were "directly attributable" to the purchase of dividend-paying stocks for two reasons.

*First*, Mr. Powell concluded that Berkshire's purchases of dividend-paying stocks were *directly attributable* to the

-8-

foregoing debt transactions because Berkshire obtained the debt-financing *for the purpose of* acquiring dividend-paying stock. (Ex. 7 at 66).

Second, Mr. Powell concluded that the debt proceeds were *directly traceable* to Berkshire's purchases of dividend-paying stocks.  *Id.*

Mr. Powell claims to have traced, step-by-step, the movements of the foregoing debt proceeds from the original debt proceeds, through intermediate short-term investments, and ultimately into dividend-paying stock.  *Id.*

Specifically, Mr. Powell claims to have made the following traces:

> a.   First, he claims to have directly traced a portion of the proceeds from the $150 million debenture to the purchases of $140,762,414 of Coca-Cola stock, between August 1988 and February 1989.  This trace is referenced as traces 1A, B, and C in Mr. Powell's 2004 Report.
>
> b.   Second, he claims to have traced proceeds from the $100 million debenture to the purchases of $74,874,507 of Coca-Cola stock and $1,191,929 of Melville stock between August 1988 and February 1989.  These traces are referenced as traces 2D1 and 2D2 in Mr. Powell's 2004 Report.
>
> c.   Third, he claims to have traced proceeds from the $391 million zero-coupon bond issue to the purchase of $147,692,363 of Champion International stock and $81,695,000 of US Air stock between September 1989 and December 1989.  These

-9-

> traces are referenced as traces 3A and
> C, and 3B and D in Mr. Powell's 2004
> Report.
>
> d.   Fourth, he claims to have traced
>      proceeds from the $109 million Housing
>      Contract to purchases of $40,700,688 of
>      Rorer stock, $12,938,725 of Time-Warner
>      stock, and $21,362,460 of Wells Fargo
>      Stock between January 1990 and July
>      1990.  These traces are referenced as
>      traces 4D and E, 4F1 and G2, and 4H21 in
>      Mr. Powell's 2004 Report.

(Ex. 21 at 6).

While these traces were received into evidence, they cannot practically be set out in detail here due to their voluminosity.

The dispute over Mr. Powell's traces involves the methodology he utilized in conducting them.

Mr. Powell's traces can be categorized into two groups of traces based on the methodology he used to trace the debt proceeds.

## A.   The Traces to the Coca-Cola, Melville, Rorer, Time-Warner, Wells Fargo, and Champion International Stocks

The first group of traces consists of Mr. Powell's traces to the purchases of the Coca-Cola, Melville, Rorer, Time-Warner, Wells Fargo, and Champion International stocks.

Mr. Powell utilized the same methodology to trace the debt-proceeds to the purchase of each of these dividend-paying stocks.

-10-

Mr. Powell commenced each of these traces by arbitrarily allocating the debt proceeds to investments that were made on the same day the proceeds were deposited into NICO's account. For example, Mr. Powell allocated the proceeds from the $150 million debenture, which were deposited into NICO's account on January 13, 1988, to three different securities that were purchased that same day; he traced $50 million of the proceeds to the purchase of GMAC, $50 million to GE, and $50 million to Sears. Mr. Powell's decision to put $50 million into each of these securities was purely arbitrary. Mr. Powell could just as easily have attributed the proceeds to Allegis and EF Hutton securities that were also purchased on January 13, 1988.

Mr. Powell used this same allocation rationale in initiating his traces of the $100 million debenture and the $109 million Housing Contract.

Once the proceeds were allocated to a particular security, Mr. Powell purported to trace the proceeds from that security through dozens, and in some traces, hundreds, of securities purchased over the course of up to twelve months to the ultimate purchase of dividend-paying stock. In trace A, for example, Mr. Powell traced the proceeds of the $150 million debenture through approximately 154 security transactions over the course of a year before he finally attributed a portion of the proceeds to the purchase of Coca-Cola stock.

-11-

The two main criteria used by Mr. Powell in tracing the proceeds from one security to the next were: (1) matching transactions that occurred on the same day to one another, (T.T. at 317:16-17), and (2) matching transactions with similar sized dollar amounts to one another.  (T.T. at 346:21-24).

If Mr. Powell could not match the dollar amounts between a sell and buy on any one given day, he would arbitrarily allocate the proceeds to any security or securities that were purchased on the same day.  (T.T. at 317:20-25).  Moreover, whenever possible, Mr. Powell would attribute the proceeds to the purchase of Coca-Cola stock.  (T.T. at 318:19-22).  Mr. Powell believed that it was rational to attribute the proceeds to the purchase of Coca-Cola stock due to Berkshire's billion dollar position in Coke.  (T.T. at 317:3-6).

Thus, both the initiation and continuation of Mr. Powell's traces were dependent on his ability to arbitrarily allocate funds in NICO's account.

As is explained in the following trial excerpts, Mr. Powell believed that he could arbitrarily allocate funds in NICO's fungible account to the purchase of dividend-paying stock, for no reason, other than the fact that the funds had been deposited into NICO's account.

> Q [by Berkshire's counsel]:
>
>> Let's assume that on a given day, $50 million came into the account from six

different securities and one of those
securities had $5 million in it that you
'traced.' And on that day, seven
securities are purchased totaling $50
million and there's a $6 million, and an
$8 million and a $9 million.  It's the
case, is it not, that on that day no
human being really knows which money
went where, did they -- do they?

A [by Mr. Powell]:

    No.

Q:   And so unless you can make an arbitrary
allocation, your trace ends, doesn't it?

A:   You have to make an arbitrary
allocation.

Q:   Why?

A:   Because the money's still being applied.
It's -- it hasn't disappeared.

Q:   It hasn't disappeared?

A:   Not to my thinking.

Q:   But why do you have to make an arbitrary
allocation if what you're trying to find
out is where did the money go?

A:   Well, you come to a fork in the road and
you go left or right.

Q:   But if you don't know whether it went
left or right, don't you just have to
say at that point I don't know?

A:   I don't recall that occurring.

Q:   You don't recall that occurring at any
time when you don't know whether the
money went to security A or security B
that you had to simply say, I really
don't know where the money went?

-13-

A:   No, that's not what I'm saying.

Q:   The only way you were able to do this,
     what you call a trace, is every time
     that occurred, you just say, I'm saying
     it sent to -- it went to the right
     instead of the left?

A:   Yes.

Q:   And when you made that judgment, you had
     no principle upon which to make that
     judgment, right?

A:   That's true, yes.

(T.T. at 325:6-25; 326:1-17).

Q [by Berkshire's Counsel]:

     Sir, there's no question the money went
     somewhere.  The question is how you know
     where it went.

A [by Mr. Powell]:

     You arbitrarily – you arbitrarily make a
     decision and go with it.

Q:   So you're not saying where it went,
     you're just arbitrarily deeming that it
     went somewhere, right?

A:   That's true.

Q:   Out of mid air, you saying I – I, Agent
     Thomas Powell, hereby declare this five
     million went from here to there.  And
     other than Agent Thomas Powell making
     that statement, you have no principle or
     facts upon which it's based, do you?

A:   No.

(T.T. at 327:23-25; 328:1-10).

-14-

**B.    The Traces to the US Air Stock**

The second group of traces consists entirely of Mr. Powell's trace of the $391 million zero-coupon bond to the purchase of approximately $81.7 million in US Air Stock.

On August 7, 1989, Berkshire borrowed $310 million from the Bank of Boston.  (T.T. at 132:3-6; 195:20-22).

Berkshire thereafter used proceeds from this loan to fund the purchase of US Air Stock.  (T.T. at 195:19-23).

Berkshire transferred $250 million of the US Air stock to NICO.  *Id*.

An intra-company payable from NICO to Berkshire in the amount of $250 million was reflected as of August 7, 1989.  (T.T. at 132:7-11).

On September 1, 1989, Berkshire repaid the entire $310 million loan to the Bank of Boston.  (T.T. at 132:19-21; 196:5-9).

Between August 7, 1989, and September 1, 1989, NICO made payments on its intra-company obligations to Berkshire. These payments exceeded the $250 million dollars NICO owed to Berkshire for the US Air stock.  (T.T. at 258:9-12).

On September 29, 1989, Berkshire borrowed approximately $391 million from Salomon Brothers (the "$391 million zero-coupon bond").  Berkshire simultaneously transferred the proceeds from

-15-

this transaction to NICO.  (Ex. 210; (T.T. at 196:23-25; 197:1-2).

On this same day, NICO paid Berkshire approximately $95.3 million.  (Ex. 207).

Mr. Powell concluded that the $95 million payment from NICO to Berkshire was used to repay the debt NICO owed Berkshire for the US Air stock.  (T.T. at 204:22-25).

Based on this conclusion, Mr. Powell attributed a portion of the $391 million zero-coupon bond to the purchase of US Air stock.  *Id.*

## V.  Berkshire's Expert

Berkshire retained Navigant Consulting to conduct a thorough review of Mr. Powell's traces to each of the stocks at issue.  (Ex. 29 at 2).

Navigant Consulting's work was performed by Avram Tucker[4] and other Navigant Consulting professionals working at Mr. Tucker's direction.  *Id*.

Mr. Tucker prepared an expert report, which was received into evidence, summarizing his findings on the § 246A issue.  (Exs. 29 and 30).  This report was the basis of Mr. Tucker's testimony at trial.

---

[4] Mr. Tucker was recognized as an expert by the Court in the fields of accounting and forensic tracing.  (T.T. at 109:2-12).

Mr. Tucker performed two main tasks in analyzing the § 246A issue.  First, for the years 1988 through 1990, he compiled daily cash flow information from Berkshire's business records and prepared Daily Activity Reports.  (T.T. at 97:12-16; Ex. 29 at 8-9).  Second, he reviewed and evaluated Mr. Powell's traces.  (T.T. at 97: 17-20).

## A.  The Daily Activity Reports

The Daily Activities Reports prepared by Mr. Tucker show the financial results of non-securities transactions and receipts and disbursements resulting in the purchase and sale of securities that were made on the days Mr. Powell "traced" the proceeds through NICO's account.  (Ex. 32).

For each of the days Mr. Powell purportedly traced proceeds from one security to the next, Mr. Tucker was able to construct alternative cash flows to trace the proceeds.  *Id.*

Each of these alternative cash flows show that there were numerous alternative paths that the debt proceeds could have, and may just as likely have taken, on the particular day in question.  *Id.*   For this reason, Mr. Tucker concluded that Mr. Powell's "traces" only showed that there was a "theoretical possibility" that the debt proceeds were used to purchase dividend-paying stock.  (Ex. 29 at 11).

Mr. Powell does not dispute that his traces represented mere theoretical traces:

-17-

Q [by Berkshire's Counsel]:

    But, in fact, it is the case, is it not, that all of these traces do nothing more than establish that it is theoretically possible that the debt proceeds, the way you trace them, ended up in dividend-paying stock?

A [by Mr. Powell]:

    That's true.

Q:  Nothing else?

A:  No.  It just says there's a path between here and there.

Q:  They don't establish the fact, right?

A:  The fact?

Q:  They don't establish the fact that the money went from debt proceeds to this dividend-paying stock, do they?

A:  It doesn't disprove that it went somewhere -- it doesn't prove it went somewhere else either.  It just says there was a path between here and there.

(T.T. at 335:24-25; 336-1-12).

**B.  Re-Constructing Mr. Powell's Traces**

    Mr. Tucker also concluded that Mr. Powell's traces were not supported by acceptable "tracing" principles which he described in his testimony.

    Mr. Tucker testified that the word "traceable," from an accounting standpoint, means being able to make a connection between a source of money and a use of money.  (T.T. at 103: 5-

-18-

12).  He testified that there are two methods to trace, or
connect, sources and uses of funds.  (T.T. at 103:13-16).

        The first method he described was an observable
connection.  An observable connection is a connection that can
actually be seen or can been seen in supporting documentation.
(T.T. at 103:17-19).  The second method he described was a
logical connection.  A logical connection is a connection that
cannot be readily observed, but can be made by looking through
documents and finding a logical connection.  (T.T. at 103: 21-
25).  This would be the case where there is no other source of
funds available to buy a particular security.  (T.T. at 104: 1-
7).

    **C.  Mr. Tucker's Overall Conclusion**

        Based on the Daily Activity Reports and his review of
Mr. Powell's traces, Mr. Tucker concluded that it is impossible
to directly trace the proceeds at issue through NICO's fungible
account to the purchase of dividend-paying stocks.  (Ex. 29 at
8).

**VI.  Berkshire's Contentions**

        Berkshire disputes Mr. Powell's application of both the
*purpose prong and the directly traceable prong* to the borrowings
at issue.  Berkshire contends that its dominant purpose in
incurring the indebtedness in issue was to fortify and enhance
NICO's capital base and increase its net worth.  Berkshire argues

-19-

that Mr. Powell's arbitrary tracing methodology is not "direct" enough to satisfy the "directly traceable" prong of § 246A. Berkshire further contends that the proceeds from the $391 million zero-coupon bond are not attributable to the purchase of US Air Stock because outside indebtedness relating to the US Air stock was paid off one month before Berkshire engaged in the zero-coupon transaction.

CONCLUSIONS OF LAW

## I.   26 U.S.C. §§ 163 & 246A – The Statutory Framework

Under the Internal Revenue Code (the "Code"), 26 U.S.C. § 1 *et seq*., corporations are taxed on all received income, subject to certain exceptions.  Two such exceptions are the "interest expense" and the "dividends-received" deductions.  The *interest-expense* deduction permits corporate taxpayers to deduct from their taxable income an amount equal to the interest paid on the debt.  *See* 26 U.S.C. § 163(a).  The *dividends-received* deduction permits corporate taxpayers to deduct from their taxable income an amount based on dividend income received from the stock of other corporations.  *See* 26 U.S.C. § 243(a).[5]

---

[5] Congress passed § 243 to alleviate a double taxation problem.  Prior to the enactment of § 243, dividend-received income was taxed twice: once when the payor corporation paid tax on the money prior to distributing a dividend and then again when the receiving corporation paid tax on the dividend income. Section 243 alleviates this burden by generally entitling corporations to take a 70% deduction on all dividend-received income.

Prior to July 18, 1984, corporations who had borrowed money to finance the purchase of stock could combine the *interest-expense* and *dividends-received* deductions to receive a "double deduction."  By combining these deductions, corporations could virtually eliminate their tax liability on dividend-received income that had been debt-financed.

Congress enacted § 246A to curb abuse of this "double deduction."  H.R. Rep. No. 432, 98th Cong., 2nd Sess., pt. 2, 1180-81 (1984) ("House Report 432").

Section 246A reduces the dividends-received deduction allowable under § 243(a) for dividends that are paid on "debt-financed portfolio stock."[6]

Section 246A provides in pertinent part,      0

> (a) **General Rule.** — In the case of any dividend on debt-financed portfolio stock, there shall be substituted for the percentage which (but for this subsection) would be used in determining the amount of the deduction allowable under section 243, 244 or 245(a), a percentage equal to the product of—

---

[6] For example, assume that Corporation A, a 20% owned corporation, pays a dividend of $1 per share per quarter. Corporation B purchases 1,000 shares of Corporation A stock  at a total cost of $100,000, with 60% of the $100,000 being financed at 14%.  When the $60,000 debt is still outstanding, Corporation B receives dividends on the stock totaling $1,000.  Prior to the application of § 246A, the dividend received deduction is $800 (80% x $1,000).  In applying the formula in § 246A, the dividends-received deduction is reduced to $320 (60% of $800). *See* 10 Mertens Law of Fed. Income Tax'n § 38B:116.

        (1)   70 percent (80 percent in the
               case of any dividend from a
               20-percent owned corporation
               as defined in section
               243(c)(2)), and

        (2)   100 percent minus the
               average indebtedness
               percentage.

26 U.S.C. § 246A(a).

The operative language in § 246A is the term "debt-financed portfolio stock." *Debt-financed portfolio stock* is defined as any "portfolio stock" if at some time during the base period there is "portfolio indebtedness" with respect to such stock. 26 U.S.C. § 246A(c)(1).

Thus, in order for § 246A to apply, two elements must be satisfied: (1) the dividend-received stock must have been portfolio stock; and (2) there must have been *portfolio indebtedness* with respect to the stock during the base period.[7]

Portfolio stock means the stock of a corporation unless the taxpayer owns at least 50 percent (20 percent if 50 percent is owned by 5 or fewer corporate shareholders) of the total voting power and value of the stock of the corporation. 26 U.S.C. § 246A(c)(2).

--------

[7] The term "base period" is defined in § 246A(d)(4). Because interpretation of this term is not as issue in this case, its definition will not be discussed here.

Berkshire does not dispute that it owned portfolio stock during the taxable years in question.  Thus, the only issue to be resolved by the Court is whether Berkshire incurred *portfolio indebtedness* with respect to the four debt-transactions at issue.[8]

**A.   26 U.S.C. 246A & Portfolio Indebtedness**

The term "portfolio indebtedness" is defined as any indebtedness *directly attributable* to investment in portfolio stock.  26 U.S.C. § 246(a)(3)(A).

The term *directly attributable* is not defined in the Code; it is, however, defined in the legislative history accompanying § 246A's enactment.

The legislative history provides, "the directly attributable requirement will be satisfied if there is a *direct relationship* between the debt and an investment in stock."  H.R. Rep. No. 432 at 1181 (emphasis added).  House Report 432 further clarifies that debt that is "clearly incurred for the purpose of acquiring dividend paying stock *or* otherwise directly traceable to such an acquisition" constitutes portfolio indebtedness.  *Id*. (emphasis added).

_____

[8] Portfolio indebtedness can exist in a controlled group situation.  Thus, § 246A applies where one member of an affiliated group incurs the portfolio indebtedness and another member of the group acquires the stock.  H.R. Rep. No. 432 at 1181.

-23-

Both parties cite to this legislative history and are in agreement that the *directly attributable* requirement in § 246A is satisfied where indebtedness (1) is clearly incurred for the purpose of acquiring dividend paying stock <u>or</u> (2) is otherwise directly traceable to an acquisition of portfolio stock.  Each of these alternative analyses will be addressed in turn.

**1.   The Purpose Prong**

The Service concluded that Berkshire's dominant purpose in incurring the indebtedness at issue was to purchase dividend-paying stocks.  In reaching this conclusion, Mr. Powell did not cite to any evidence in which Berkshire expressed this intent.  Rather, Mr. Powell *inferentially* concluded that the funds had to be borrowed for investment purposes because a company like Berkshire, who was already adequately capitalized, would have no other purpose for borrowing such funds.  As Mr. Powell explained in his audit report:

> Contributions of proceeds to insurance companies that were adequately capitalized and had significant cash flow from operations leads one to believe that the funds were borrowed for investment.  The taxpayer acquired significantly more stocks than bonds in 1988 and 1989.  Stocks pay dividends and yield capital gains and losses.  Purpose is generally shown by what actually happened, which leads one to the conclusion that the purpose was to acquire stocks.

Ex. 7 at 66.

-24-

However, this explanation assumes that it can be determined what actually happened to the proceeds of the borrowings in question. In this case, that cannot be done, and Mr. Powell accedes to this conclusion. (T.T. at 327:23-328:10; 335:24-336:12.) Berkshire contests this finding, arguing that it incurred the indebtedness at issue to fortify and enhance NICO's capitalization.

The only reported federal decision addressing the purpose prong in § 246A is the Eighth Circuit's decision in *H-Enterprises International, Inc. v. Commissioner of Internal Revenue*, 1893 F.3d 907 (8th Cir. 1999), *aff'g*, T.C. Memo 1998-97.

H Enterprises ("HEI") was a closely-held corporation whose shareholders were four individuals and a set of family trusts. 75 T.C. Memo 1998-97 at 1949. In October of 1987, HEI enacted a "restructuring plan," transferring the assets of one of HEI's businesses to a newly created subsidiary ("Waldorf II"). The HEI shareholders then entered into a "shareholder agreement," pursuant to which the company was divided into four separate divisions, including two "Investment Divisions." *Id*.

On December 18, 1987, the Waldorf II board passed a resolution to borrow $175 million and declare a $92 million dividend, payable to its parent, HEI. *Id.* At 1950. A few days after declaring the dividend, Waldorf II used the $175 million in borrowed funds to make the dividend distribution to HEI. HEI

-25-

equally divided $64 million of this distribution into each of the two "Investment Divisions." *Id*. "Other than investment returns, the cash distribution [from Waldorf II] was the *only* significant source of funds for the Investment Divisions." *Id.* (emphasis added). The Investment divisions acquired, *inter alia*, dividend-paying stock within weeks of the cash distribution. *Id*. at 1952.

The Service determined, the Tax Court held, and the Eighth Circuit agreed, that § 246A reduced the dividends-received deduction regarding this stock. In reaching this conclusion, the Tax Court relied on the proximity between the borrowing, the transfer of the borrowed funds to HEI, and the immediate disbursement of those fund to the Investment Divisions. *Id*. at 1952. The Tax Court explained:

> We are, thus, satisfied that, here, where the borrowing and distribution are all part of a preplanned sequence, the distributed funds are distributed to a parent corporation, and those funds are used to purchase tax-exempt obligations and domestic shares, *the required purposive connection has been shown*.

*Id.* (emphasis added). The court ultimately concluded, based on the restructuring plan, the shareholder agreement, and the sequence of events that followed, that Waldorf II's *dominant purpose* for incurring the 1987 indebtedness was to make a cash

distribution to HEI to enable HEI to purchase tax-exempt obligations. *Id*. at 1950.[9]

The issue to be resolved is whether, in incurring the indebtedness at issue, Berkshire's dominant purpose was to acquire dividend-paying stocks. Having carefully reviewed the arguments of both parties and the evidence submitted in support thereof, the Court finds that there is no reasonable basis on which it could conclude that Berkshire's dominant purpose in incurring the indebtedness at issue was to acquire dividend-paying stocks. Three main findings support this conclusion.

The first, and most predominant, factor is the tenuous relationship between the indebtedness and the dividend-paying stocks at issue. Three factors make the relationship between the indebtedness and the dividend-paying stocks tenuous: (1) the significant time lapses between the dates of indebtedness and Berkshire's purchases of dividend-paying stocks; (2) the number of transactions Mr. Powell "traced" the proceeds through before he finally attributed the proceeds, or a portion thereof, to purchases of dividend-paying stocks; and (3) Mr. Powell's arbitrary allocation methodology. Together, these factors do not support any inference that Berkshire's purchases of the stocks were part of a pre-planned sequence nor do they reasonably permit

---

[9] Government's counsel stipulated that the purchase of dividend-paying stocks must have been the dominant purpose of the borrowings. (T.T. at 465: 21-25; 466: 1-6).

a finding that Berkshire incurred the indebtedness with the
intent or for the purpose of using the proceeds to purchase
dividend-paying stocks.

These factors do, however, support an inference that
Mr. Powell's goal, in auditing Berkshire's books, was to "trace"
the debt proceeds to dividend-paying stocks by any means
possible.  Mr. Powell "traced" the proceeds through dozens, and
at times hundreds, of transactions, often occurring over the
course of a year, by arbitrarily allocating the proceeds from one
security to the next until he could attribute the proceeds to
purchases of dividend-paying stocks.  For example, in order to
attribute $140,762,414 of the $150 million debenture to the
purchase of Coca-Cola stock, Mr. Powell "traced" the proceeds
through approximately 154 securities transactions, over the
course of a year, before his trace of the $150 million debenture
ended.

The second factor the Court relies on in reaching this
conclusion is the uncontradicted testimony of Mr. Buffett, which
establishes that Berkshire's dominant purpose in incurring the
indebtedness was to increase and fortify NICO's capital base.
While Mr. Buffett does not dispute that the proceeds were to be
invested, his testimony establishes that he did not know how the
debt proceeds were to be invested at the time Berkshire engaged
in the borrowing transactions.  The fact that Mr. Buffett did not

-28-

know how the proceeds were to be invested until the day the proceeds were acquired, rebuts the inference that Berkshire's dominant purpose in incurring the indebtedness was to purchase dividend-paying stocks.

The third and final factor the Court relies on is the government's failure to set forth any persuasive argument to rebut Berkshire's case.  The government advanced two rebuttal arguments at trial.  First, the government urged the Court to infer that Berkshire's dominant purpose in incurring the indebtedness was to acquire dividend-paying stocks based on the fact that Berkshire acquired significantly more stocks than bonds in 1988 and 1989.  This argument is unpersuasive.  The mere fact that the debt proceeds may have ultimately been used to purchase stocks does not establish that Berkshire intended to purchase *dividend-paying* stocks at the time it incurred the indebtedness.

Second, the government urged the Court to infer that Berkshire's dominant purpose in incurring the indebtedness was to purchase dividend-paying stocks because Berkshire desired to expand its equity investing to offset net earning losses from insurance underwriting.  This argument is equally unpersuasive. It is undisputed that Berkshire intended to, and ultimately did, invest the debt-proceeds in equity securities.  The term "equity securities," however, encompasses both dividend *and* non-dividend paying stocks.  Therefore, the fact that Berkshire invested the debt proceeds in equity securities, does not, as the government

-29-

argues, inferentially lead to the conclusion that Berkshire incurred the indebtedness to purchase *dividend-paying* equity securities.

Accordingly, the Court concludes, based on the tenuous nature of the traces, Mr. Buffett's uncontradicted testimony, and the government's failure to set forth any credible purpose arguments, that the Service erroneously determined that Berkshire's dominant purpose in incurring the indebtedness was to acquire dividend-paying stocks.

## 2.  The "Directly Traceable" Prong

Interpretation of the term "directly traceable" has not been the subject of any reported federal decision.  Its interpretation, therefore, presents an issue of first impression. The Court's only guidance on this issue comes from House Report 432, a House Conference Report accompanying § 246A, and a single 1988 Revenue Ruling.  *See e.g. Gen. Dynamics Land Sys., Inc. v. Cline,* 540 U.S. 581, 600 (2004) (looking to "text, structure, purpose, and history" of the ADEA to determine its meaning).

House Report 432 provides that the "direct attribution" test will be satisfied where indebtedness "is clearly incurred for the purpose of acquiring dividend-paying stock or *otherwise is directly traceable to such an acquisition*."  House Report 432 at 853.  Although the House Report does not expressly define "directly traceable," the Report does lay out three examples

-30-

which indirectly define the term's meaning: (1) stock held in a
margin account with a securities broker; (2) any non-recourse
loan secured, in whole or in part, by dividend-paying stock; and
(3) monies received by a taxpayer as proceeds of a short sale.
The House Conference Report on § 246A also added a fourth
example: (4) "purchase money indebtedness" created when "a
corporation buys stocks [by] issuing its own debt obligation to
the seller."  H. Conf. Rep. No. 98-861, 3 U.S.C.C.A.N. at 1501,
98th Cong., 2d Sess. (1984).

     IRS Revenue Ruling 88-66 examines three additional
situations that illustrate when indebtedness is directly
attributable to an investment in portfolio stock.  Rev. Rul. 88-
66, 1988-2 C.B. 34.  The third situation discussed in this ruling
is relevant to the Court's inquiry:

> Y Corporation was engaged in
> the active conduct of business.
> Y intended to expand its plant
> within the next eighteen months
> and wished to finance the
> expansion using long-term debt.
> Because the market conditions
> were favorable for a debt offering,
> Y issued its debt in advance of
> the planned construction and
> temporarily invested the proceeds
> it received in portfolio stock.

As to this situation, the ruling held:

> The debt issued to finance the
> construction of the new plant the
> proceeds from which are
> temporarily invested in portfolio
> stock is indebtedness directly

> attributable to investment in
> portfolio stock.  The fact that
> this is a temporary investment does
> not  change the result, because
> section 246A of the Code does not
> rely on the ultimate purpose for
> the indebtedness *if it clear that*
> *the loan proceeds were actually*
> *used to buy portfolio stock.*

*Id.* (emphasis added).

The only other source of legislative or regulatory guidance regarding the interpretation of "directly traceable" comes from the fact that Congress rejected the use of any allocation or apportionment formulas or fungibility concepts in interpreting § 246A.  House Report 432 at 853.  In the years surrounding the enactment of § 246A, Congress enacted other legislation that applied an allocation approach to specific classes of institutional taxpayers that engage in repeated borrowing and investment transactions.  For example, in 1982, two years before § 246A was enacted, Congress enacted § 265(b), which applies an across-the-board allocation formula to banks and other financial institutions.  Section 265(b) reduces these taxpayers' interest deductions by a pro rata amount of interest allocable to securities yielding tax-exempt income.  Three years later, in 1985, Congress enacted § 832(b)(5)(B), which imposes a similar

across-the-board reduction in insurance companies' loss-reserve deductions.[10]

> ### A. The Traces to the Coca-Cola, Melville, Rorer, Time-Warner, Wells Fargo, and Champion International Stocks

Berkshire argues that § 246A is inapplicable to the four debt transactions at issue because, unlike the legislative and regulatory examples, there is no direct, or immediate connection between any of the money that Berkshire borrowed and any of the stock it bought. Berkshire contends that Mr. Powell's tenuous tracing methodology is antithetic to the direct relationship required by § 246A and its legislative history. For reasons set both below, the Court agrees.

> #### 1. The Plain Meaning of "Directly Traceable"

First, the Court finds that Mr. Powell's theoretical traces are inconsistent with the plain meaning of the term "directly traceable." *See Watson v. Ray*, 192 F.3d 1153, 1155 (8th Cir. 1999) (when no specific definition of term is given in the statute itself, court should look to the ordinary common sense meaning of the words). The term "direct" connotes an

---

[10] Insurance companies are permitted to reduce their taxable income in proportion to their "loss reserves," which are accounts that insurers need to cover losses that their insureds have incurred but that have not yet been paid. Section 832(b)(5)(B) reduces the deduction an insurer may take for its loss reserves by a specified portion of the company's income from investments producing tax-exempt income or dividends received from a corporation not 100% owned by the insurance company.

-33-

immediate result.  *See* Random House Dictionary of the English Language 559 (2d unabridged ed. 1987).  Mr. Powell's traces, however, are not immediate in any sense.  His traces, which involved arbitrary allocations of funds over the course of several months through numerous transactions, are virtual antonyms to the plain meaning of the term "direct."

### 2.   The Legislative and Regulatory Examples

Second, the Court finds that the attenuated connection between the debt-proceeds and the dividend-paying stocks are inconsistent with the legislative and regulatory examples that have been enumerated to aid in the interpretation of § 246A.  In each of the examples listed *supra*, there is an immediate, observable or actual connection between the indebtedness and the stock.  None of the traces conducted by Mr. Powell, however, show an immediate connection between the debt proceeds and the stocks.  The government attempts to downplay the importance of these examples by arguing that they were not intended to be exhaustive.  This argument, however, does not undermine the persuasiveness of the examples.  While these examples were not likely intended to be exhaustive, they were intended to be instructive.  It logically follows that § 246A should be interpreted in a manner that is consistent with these examples.

-34-

### 3.   Use of A Fungibility Concept

Third, the Court finds that Mr. Powell's use of a fungibility concept in tracing the debt proceeds is inconsistent with the legislative history of § 246A.  As explained *supra*, Congress expressly rejected the use of a fungibility concept in interpreting § 246A.  H.R. 432 at 853.  Nonetheless, Mr. Powell, aware of this legislative history, utilized a fungibility concept in his traces.  Mr. Powell's use of a tracing principle that he knew to be expressly rejected by Congress undermines both his credibility and the validity of his traces.

Because Mr. Powell's traces are inconsistent with the plain language of § 246A and the legislative and regulatory history interpreting § 246A, the Court concludes that Mr. Powell erroneously attributed proceeds from the borrowings to the purchases of the Coca-Cola, Melville, Rorer, Time-Warner, Wells Fargo, and Champion International stocks.

### B.   The Traces to US Air Stock

Berkshire argues that the proceeds of the zero-coupon bond issue cannot be attributed to the purchase of US Air stock because the intra-company debt relating to the US Air stock was paid off on September 1, 1989, one month before the zero coupon proceeds were issued.

The government does not dispute that there was no longer any outside indebtedness relating to the US Air stock as

-35-

of September 1, 1989.  Rather, the government argues that $95 million of the $391 million zero-coupon proceeds were used to partially repay the intra-company indebtedness owed by NICO to Berkshire for the US Air stock.  The government's argument, however, is not supported by any logical construction of the facts or law.

Revenue Ruling 88-66 provides in pertinent part:

> Absent circumstances that demonstrate a direct relationship between outside group indebtedness and investment in portfolio stock,[] intercompany loans do not trigger the application of section 246A of the code.  This is because, in the consolidated return context, intercompany loans generally create a wash for federal income tax purposes and do not create the potential for tax avoidance that section 246A was designed to prevent.

Therefore, pursuant to this ruling, the fact that NICO may have owed Berkshire money relating to the US air stock after September 1, 1989, is irrelevant under Ruling 88-66.  Accordingly, the Court concludes that Mr. Powell erroneously attributed a portion of the $391 million zero-coupon proceeds to the purchase of US Air stock.

## CONCLUSION

In sum, the Court concludes that Mr. Powell's traces do not satisfy either the purpose prong or the directly traceable prong set forth in the legislative history accompanying § 246A.

-36-

Accordingly, the Court concludes that the Service erroneously applied § 246A to reduce Berkshire's dividends-received deduction relating to purchases of the dividend-paying stocks for the 1989, 1990 and 1991 calendar tax years.

In reaching this conclusion, the Court is cognizant of the fact that § 246A's current statutory and regulatory regime makes it virtually impossible for the Service to trace debt proceeds and thus assess tax deficiencies under § 246A against companies like Berkshire who engage in numerous investment transactions.  However, any decision to loosen the "direct" connection required between debt-proceeds and the purchase of dividend-paying stocks must be made by Congress or the Service, not the courts.  In fact, the Service, apparently recognizing the difficulty in applying § 246A to companies like Berkshire, has already taken steps to alter the necessary linkage required by § 246A.  On May 7, 2004, the Service issued an announcement requesting comments on whether regulations should be adopted that would supplement the specific tracing rule in § 246A with a pro rata allocation rule to determine the use of borrowings that are not traceable to a specific use.  *See* 69 FR 25534.

The parties are directed to meet and confer on the amount of the total refund of taxes and assessed interest, if any, due to Berkshire.  On or before November 28, 2005, the

parties shall submit a joint proposed judgment setting forth the amount due to Berkshire.

DATED this 28th day of October, 2005.

BY THE COURT:

/s/ Lyle E. Strom

_____
LYLE E. STROM, Senior Judge
United States District Court